UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| JULIE MELOY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:06-CV-0188-SEB-JMS |
| | ) | |
| COMPUTER ASSOCIATES | ) | |
| INTERNATIONAL, INC., | ) | |
| Defendant. | ) | |

**ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on the motion for summary judgment filed by

defendant CA, Inc. ("CA"), previously known as Computer Associates International, Inc.[1]

Plaintiff, Julie Meloy ("Meloy"), is a former CA sales executive who alleges in her

complaint that CA breached its contract with her, committed theft and civil conspiracy

against her, and violated the Indiana Wage Payment statute to her detriment.  These

allegations arise from two separate sales transactions.

First, Meloy contends, CA failed to pay her the appropriate commission which she

earned in connection with a December 2004 transaction between CA and Sallie Mae (the

"Sallie Mae transaction") and thereby breached its contractual obligations to her and

violated the Indiana Wage Payment Statute.  Second, Meloy maintains that her supervisor

(Ms. Klug) illegally forced the removal from Meloy's commission account certain

---

[1]  Plaintiff Meloy filed a Motion Requesting Oral Argument on Defendant's Motion for
Summary Judgment.  Having considered the parties briefings on the Motion for Summary
Judgment and finding them sufficient, we hereby <u>DENY</u> Plaintiff's motion for oral argument as
moot.  Docket No. 67.

revenue that had been generated by Meloy during a March 2005 transaction with Conseco (the "Conseco transaction") and transferred it to the commission account of another sales executive, thereby depriving her of approximately $6500.00 in earned income.  CA contends that Meloy's complaint cannot survive summary judgment because the company has paid Meloy all the commissions to which she was entitled for the Sallie Mae transaction and that, in reallocating the accounts funds relating to the 2005 Conseco transaction, CA did not act to deprive Meloy of any commissions to which she was otherwise entitled.  For the reasons detailed below, we GRANT CA's motion for summary judgment in its entirety.

Meloy originally filed this action in the Marion Superior Court.  CA timely removed this cause to this court based on diversity jurisdiction, asserting that the matter in controversy exceeds the value of $75,000.00, exclusive of interest and costs, and involves citizens of different states.  See Notice of Removal, Docket No. 1, 28 U.S.C. § 1332(a) and (c), 42 U.S.C. § 1446(b), 28 U.S.C. § 1441.  CA is a Delaware corporation with its principal place of business located in New York and Meloy is a resident of Indiana.

## I.      STATEMENT OF MATERIAL FACTS

### A.      CA's Business and Meloy's Sales Executive Position

CA is an independent provider of information technology management software. This software includes programs for the management of systems, networks, storage,

security, applications and databases.  (Kozak Dec. ¶ 3.)  CA hired Meloy in July 1999.

(Meloy Dep., p. 36.)  In April 2004, Meloy obtained a position as a Data & Life Cycle

Management Sales Executive with CA.  (Meloy Dep., p. 47.)  CA sales executives market

the company's products, including new product licenses, and "Services and Education."

(Meloy Dep., Ex. 3 § 2.2.1.)  "Services and Education" is a term of art used by CA which

encompasses physical maintence, help desk support, and training on new software.

Meloy Aff. ¶ 5.

When serving as a sales executive, Meloy's supervisor was Sales Manager Mary

Klug ("Klug").  (Meloy Dep., p. 49.)  Klug was responsible for evaluating Meloy's job

performance and for managing, processing, and distributing commissions earned by the

sales executives she oversaw.  (Def. Interrog. Response, No. 6.)

### B.     The Fiscal Year 2005 Incentive Compensation Plan

For the year April 1, 2004 through March 31, 2005, the "Computer Associates

International, Inc. Incentive Compensation Plan" (the "Compensation Plan") provided

guidelines pursuant to which sales executives, including Meloy, were to receive

commissions.  (Kozak Dec. ¶ 7 Ex. 1; Meloy Dep., pp. 48-49, 53-54 Ex. 3.)

The Compensation Plan provided that Data & Life Cycle Management ("DLCM")

Sales Executives, including Meloy, were entitled to commissions at the rates specified in

their individual Wealth Enabling Plans ("WEP") on completed New Product and

Distributed Product Capacity Transactions for DLCM Products (inclusive of its

3

Maintenance) and on all Services and Education bookings[2] related to Data & Life Cycle Management Products in the Sales Executives territory.[3]  (Meloy Dep., Ex. 3, p. CAI0017.)  A Sales Executive's individual "Wealth Enabling Plan" or "WEP" sets out the rates that CA was to apply in calculating commissions on sales made pursuant to the Compensation Plan.  The Plan is organized into five Chapters only three of which are relevant here:  Chapter 1 includes general provisions applicable to all parts of the plan, Chapter 2 pertains to Direct Sales Organization Provisions, and Chapter 4 pertains to CA Technology Services Provisions.

### 1.    Run rate transactions

According to the testimony of Dennis Kozak, CA's Vice President of Sales Execution, the Compensation Plan is designed to create an incentive for sales executives to ensure a constant payment stream to CA when deals with existing clients extend over time.  Kozak Dec. ¶ 9.  Sales executives are rewarded by increased commission rates (according to the rates specified in each individual WEP) when new transactions with an existing client provide at least as much, if not more, revenue to CA as was previously

---

[2]  Section 2.2.3 of the Compensation Plan specifically provides that a Data & Life Cycle Management Sales Executive "will receive commission (but not quota attainment) for all Services and Education bookings related to DLCM Products in the Exec's Territory."

[3]  The Compensation Plan provides that a Sales Executive is eligible to earn Commissions for "Services" or "Education" transactions to the extent that the transactions satisfy the requirements of the Compensation Plan.  Qualified service transactions include CA's service and educational offerings provided to customers under a "Statement of Work" or other CA Technology Services Transaction Documents approved for use by sales executives.  (Meloy Dep., Ex 3, §2.2.1(b), CAI0015.)

committed by that customer in a prior transaction that involved payments extending over a period of time.  CA calculated commissions for such a transaction on the basis of the "run rate," which was defined as:

> the sum of the average annual payment(s), under each applicable agreement and/or amendment relative to the agreement(s) being extended (and the period of time of extension for each applicable agreement) received by or committed to CA, either directly or indirectly (through a third party) from the Customer, through the applicable term of each agreement.

(Kozak Dec. ¶ 10; Comp. Plan, Ex. 1, § 2.3.2(a).)  Commissions were not payable if the run rate of the "run rate transaction" amounted to less than 70 percent.  (Kozak Dec. ¶ 12.)

The Plan provides that CA has the exclusive right to determine whether the requirements for commission payments were satisfied as well as the values to be used in run rate calculations, and further that CA's decision was final and binding on all affected parties.  (Kozak Dec. ¶ 17; Ex. 1, § 1.3.3(e); Kozak Dec. ¶ 13; Ex. 1, § 2.3.2(g); Meloy Dep., pp. 57, 113-14.)  CA explains that it determined the values used in run rate calculations based on the business context of the transaction and other similarly appropriate factors, and that it reserved the right to determine the value to be used in view of the fact that transactions often included non-standard provisions, such as business concessions, special licenses, settlements, or disparities in respective products, capacity or metrics.  (Kozak Dec. ¶ 14; Ex. 1, § 2.3.2(g).)

## 2.      Overview of Meloy's Compensation

Meloy received a base salary of sixty-five thousand dollars ($65,000.00) per year, plus commissions.  (Meloy Dep., p. 50.)  As a sales executive during Fiscal Year 2005, Meloy was entitled to commissions at the rates specified in her Wealth Enabling Plan ("WEP").[4]  (Kozak Dec. ¶ 11; Meloy Dep., pp. 63-64; Ex. 4.)  Meloy's WEP included a series of commission rates ranging from 5.02% to 11.05% for sales in the category of "New Product and Distributed Capacity," a commission rate of 3.00% for sales of "CA Technology Services & Education Prior to August 1, 2004," and of 4.00% for sales of "CA Technology Services & Education – Effective August 1, 2004."  (Meloy Dep., Exh. 4; MEL000258, Document 50-14.)  For run rate transactions Meloy was entitled to receive a commission of 5.02% ("Threshold Rate"), if the run rate was at least 70%, but less than 100%.  (Meloy Dep. Ex. 4.)  If the run rate reached the 100% level or above, Meloy was to receive a 10.05% rate ("Commission Rate").  (Meloy Dep. Ex. 4.)

## 3.      Effect of Business Review Documents on Commission

During the process of negotiating a transaction, sales executives (and others) were

---

[4] Meloy's WEP details four rates applicable to her New Product and Distributed Capacity commission calculation: 1) standard threshold rates; 2) standard commission rates; 3) accelerated threshold rates; and 4) accelerated commission rates. (Meloy Dep., Ex 4, MEL000257.)  Standard threshold rates apply only when New Product and/or Distributed Capacity are added to a Run Rate Transaction and the overall run rate of the new transaction falls below one hundred percent (100%) of the existing run rate.  (Meloy Dep., Ex 4, MEL000257.)  Standard commission rates, which are twice as high as threshold rates, apply when the run rate is one hundred percent or higher.  Id.  Accelerated rates apply to both threshold rates and commission rates once a DCLM Sales Executive reaches one hundred percent (100%) of their quota for the year.  (Meloy Dep., Ex 4, MEL000257.)

required to prepare and submit certain business review documents, including a Business Analysis Report Form ("BARF").[5]  (Kozak Dec. ¶ 15; Meloy Dep., pp. 70-71; Thomas Dep., pp. 48, 51.)  However, the Compensation Plan provided that business review forms did not entitle a sales executive to a particular commission payment and that such forms could be reviewed by management at a later date.[6]

### 4.    Commission Payouts

Commissions accruing under the Compensation Plan were payable when CA received full payment of all monies due from a Customer during the initial twelve (12) month period and all other requirements included in any contract documents were fully satisfied. (Meloy Dep., Ex. 3, § 1.3.3(b), p. CAI0010.)  If a commission amounted to between $100,000.00 and $500,000.00, only fifty percent (50%) of the amount due would be paid during the initial monthly commission payment period, with the balance payable

---

[5]  We use the acronym created by CA, wondering each time why they could not have found a more agreeable reference for this document.

[6]  The Compensation Plan provided:

> CA's approval of any data submitted by an Exec through such business review forms shall not in and of itself be construed as CA's acceptance of the Transaction or of an entitlement to Commissions or any advances under this Plan.  Furthermore, the use or approval of any such business review form does not preclude further legal, technical or business review of the terms and conditions of the proposed Transaction at any time by any level of CA management should circumstances require such review.

Kozak Dec. ¶ 16; quoting Ex. 1, § 1.1.4(c).

upon CA's receipt of the customer's payment of the initial invoiced amount.  (Meloy Dep., Ex. 3, §1.3.3(c)(ii), p. CAI0010.)  DCLM Sales Executives (including Meloy) received monthly commission statements reflecting transactions eligible for commissions as determined by CA.  (Meloy Dep., Ex 3, §1.3.3(f)(I), CAI0012.)

### 5.      The Compensation Plan's Dispute Resolution Procedures

CA sales executives were required to direct all inquiries about the Compensation Plan or their commissions to the CA PeopleCall Center, either by phone or the intranet. (Kozak Dec. ¶ 18; Ex. 1, § 1.1(a).)  Employees in the PeopleCall Center then directed the sales executives to appropriate sources of assistance and opened an "issue" in the name of the sales executives to allow CA to track the resolution of each inquiry.  (Kozak Dec. ¶ 19; Ex. 1, § 1.1.)

### C.      The December 2004 Sallie Mae Transaction

Based on previous transactions between Sallie Mae and CA, on December 23, 2004, Sallie Mae was obligated to pay CA the sum of $7,931,507, with a final payment of $7,392,729 due a year later, on December 23, 2005.  (Kozak Dec. ¶ 21.)  In November 2004, Sallie Mae had requested that CA restructure its payments in order to lower the amount of the December 2004 payment.  (Thomas Dep., pp. 55, 61.)  CA explains that, in an effort to retain Sallie Mae's business (which we assume it valued, given the size of the account), it acceded to Sallie Mae's request and agreed to reduce Sallie Mae's December 2004 payment and negotiated a one-year extension of the deal, making the final payment due in December 2006, rather than December 2005.  CA also was able at this time to sell

a new product license to Sallie Mae.  Meloy was the sales executive for the newly

licensed product.[7]  (Thomas Dep., pp. 62-63, 76-77, 80-81, 86, Ex. ET-2; Meloy Dep., pp.

98-99.)

Ed Thomas, a business manager with CA, prepared the requisite BARF for the

transaction.  (Thomas Dep., p. 108 Ex. ET-2.)  Because this transaction included a "time"

element (i.e., the existing license was extended by a year), it was treated as a run rate

transaction, which Thomas calculated as 140% (1.3991188).[8]  (Meloy Dep. p. 107, Ex. 3

§ 3.4.2; Thomas Dep., pp. 90-92, 08, 147, Ex. ET-2.)  Approvals for the deal were

ultimately secured and it closed on December 22, 2004, just in time to effect the

requested change in the payment due date of December 23, 2004.  (Meloy Dep., pp.

103-04; Thomas Dep., pp. 94-98, Ex. ET-1.)  In addition to the restructured deal, Sallie

Mae committed to pay for Services and Education bookings as part of the December 22,

2004, Rate Agreement, executed by Thomas J. Fitzpatrick, the President/COO of Sallie

Mae.  (Pl.'s Resp. at 2, 9; Meloy Dec. ¶ 5, Ex. A at MEL001089.)

Because the initially calculated run rate exceeded 100%, Meloy's December 2004

---

[7]  Meloy points out that, under the restructured plan, Sallie Mae still paid CA the
$15,324,236.00 it was already obligated to pay CA. The change simply extended the amount
payable over three years, instead of over two years.  (Thomas Dep., p 93.)  CA did, in fact,
receive less from Sallie Mae in December 2004 than Sallie Mae had previously been committed
to pay under the existing contracts, but CA received more money over all from Sallie Mae as a
result of restructuring the deal than if the deal had not been recast.  (Resp. at 15, see also Meloy
Dep., pp. 104-06.)

[8] Meloy acknowledged during her deposition that she did not know what steps Mr.
Thomas undertook to prepare the BARF, why he did or did not include certain payments, or
whether his calculations were correct.  (Meloy Dep., pp. 108, 116.)

Commission Statement reflected her entitlement to a commission of $162,055.00, based on her contributions to the Sallie Mae transaction.  (Meloy Dep., p. 107; Ex. 8.) Accordingly, CA paid Meloy the amount of $81,027.00, applying the fifty percent commission rule, pursuant to Section 1.3.2(c)(ii) of the 2005 Comp Plan (discussed above).  (Pls.' Resp. at 7, citing Meloy Dep., p. 115; Ex. 3 and 8, CAI0010.)

On January 27, 2005, Meloy caused an "issue" to be opened at the PeopleCall Center by registering her complaint that she had not yet received the remaining half of her commission.  (Meloy Dep., p. 122, Ex. 9, CAI0577-578.)  Ms. Danielle Licausi of the CA Central Commission promptly responded to Meloy's complaint on January 31, 2005, informing Meloy that there was a problem with the cash pending portion of Meloy's commission statement and that CA would release any dollars held in error for the Sallie Mae contract during the upcoming commission cycle.  (Pls.' Resp. at 8, citing Meloy Dep., Ex 9, CAI0577-578.)

In January 2005, CA's senior sales executive, Greg Corgan, requested more information about the Sallie Mae transaction and asked Ms. Ellen Taylor to recalculate the run rate, which she did by comparing the Sum of Average Annual Payments from the existing contract with the new dollars due to CA, pursuant to the December 2004 transaction (in this case, $6,710,521).  (Kozak Dec. ¶ 25, 32; Pls.' Resp. at 8, citing CAI0653.)  When the new dollars were divided by the Sum of Average Annual Payments

($6,710,521/$7,265,422), the run rate fell below 100% to 92.36%.[9]  (Kozak Dec. ¶ 37, see also Pls.' Resp. at 8, citing Thomas Dep., pp 155-158, ET-4.)  Based on Ms. Taylor's analysis, CA informed Meloy that the run rate had been miscalculated and that the commission to which she was entitled had therefore been fully paid in the amount of $81,027.  (See Pls.' Resp. at 8, Meloy Dep., pp. 126-27 Ex. 9.)

Meloy alleges in this lawsuit that the recalculation of the run rate was in error.  She supports this assertion by showing that as a part of the restructured transaction, Sallie Mae purchased an additional one million dollars worth of Services and Education products.  This purchase was not included in CA's recalculation of the run rate.[10]  (Kozak Dec. Ex. 4, CAI0561.)  By including the Services and Education monies in the run rate calculation, the amount received from Sallie Mae in the December 2004 transaction would increase to $7,710,521.22 and the run rate for the Sallie Mae Transaction would exceed one hundred percent ($7,710,521.22/$7,265,422 or 106.12%).  (Pl.'s Resp. at 9; Meloy Dep., Ex. 3, p. CAI0017; Ex. 4 MEL000257.)  Under their contract, when the run

---

[9]  CA determined that, for some reason, Thomas had improperly omitted all committed payments that were already due in 2004 and 2005 when calculating the Sum of Average Annual Payments ("AAP").  (Kozak Dec. ¶ 27; Thomas Dep., p. 132; Ex. ET-2.)  Thomas's calculation of the Sum of AAP was $5,249,675, but when the 2004 and 2005 committed payments were included, the total was $7,265,422.  (Kozak Dec. ¶ 29, 36)  In his deposition, Thomas admitted that he had "incorrectly" calculated the run rate on the transaction.  (Thomas Dep., pp. 141-42.)

[10]  The "new dollars due to CA" is found on Tab D-ELA of the "corrected" BARF.  (Pls.' Resp. at 8, citing Kozak Dec. Ex. 4, CAI0561.)  The $6,710,521.22 figure was calculated by adding the New Product Payments ($1,652,250.00) plus Time Payments ($4,201,233.00) plus Capacity Payments ($857,038.22).  (Kozak Dec. Ex. 4, CAI0561.) Both the original BARF and the "corrected" BARF reflect that Sallie Mae committed to pay $1,000,000.00 in Services and Education.  (Meloy Dep. Ex. 7, MEL000750; Kozak Dec. Ex. 4, CAI0564.)

rate exceeds one hundred percent, Ms. Meloy is entitled to the Accelerated Commission

Rate as set out in her Wealth Enabling Plan ("WEP") (Meloy Dep., Ex 4, MEL000257),

which means that CA would owe Meloy the amount of $81,027.00 in unpaid

commissions.[11]

> **D.    The March 2005 Conseco Transaction**

In March 2005, Meloy met with Conseco to discuss the possibility of Conseco

increasing the number of licenses of certain CA life cycle management products

(specifically, a product line called "Harvest") as well as the possibility of its licensing a

new CA product (Xcom).  (Pls.' Resp. at 9, citing Meloy Dep., pp 79-80.)  As with the

Sallie Mae transaction, the Conseco transaction dealt with the restructuring of Conseco's

existing payment structure, including monies which were due CA as of December 31,

2005.  (Pls.' Resp. at 9-10, citing Meloy Dec. ¶ 15, Ex. E.)  At approximately the same

time, Craig Sander ("Sander") also approached Conseco to sell his software product,

Service Desk, but was informed by Conseco that it was not interested in making such a

---

[11]  In reply, CA contends that Meloy is not qualified to determine the run rate for the
Sallie Mae transaction and that her statements regarding the composition of the run rate are
based solely upon her own limited knowledge.  CA argues that Meloy testified that her
knowledge is "insufficient to calculate the run rate," and, as such, "her affidavit testimony on
this issue (paragraph 8) is without foundation, is rank speculation, and therefore inadmissible,
and should be stricken."  Reply at 6, citing Box v. A & P Tea Co., 772 F.2d 1372, 1378 (7th Cir.
1985).  Our reading of Meloy's deposition and affidavit does not yield this conclusion; instead
by our assessment Meloy admits that she trusted CA's employee, Ed Thomas, to compute the
correct run rate and that to calculate the run rate herself she would need particular documents, a
calculator and spreadsheet.  Accordingly, we find no basis to strike Meloy's affidavit on this
issue.  She entered into a contract which provided the terms by which her commission was to be
paid and she is entitled to testify as to her beliefs regarding the methodology for applying these
terms to the work she performed.

purchase.  (Meloy Dep., p 80.)  Meloy contacted Conseco thereafter and succeeded in
persuading it to reconsider its decision not to acquire Sander's Service Desk software,
which Conseco eventually agreed to do.[12]  (Meloy Dep., pp. 80, 81-83.)

At the time Conseco agreed to make that purchase, Sander was $58,500 short of
reaching his annual sales quota (the fiscal year ended March 31, 2005), which, had he
reached it, would have entitled him to an all expenses paid "Compass Club" incentive trip
to Hawaii later in the year.  (Pls.' Resp. at 10, citing Meloy Dep., pp. 66-67; 84-85;
Kozak Dec. ¶ 7.)  Meloy had at that time exceeded her annual sales quota, prompting
Klug, Sander and Meloy to discuss the internal movement of some of the value of the
Conseco transaction from Meloy's product set to Sander's product set, thereby allowing
Sander to reach his quota and to participate in the Compass Club trip.[13]  (Meloy Dep., pp.
83-85, Ex. 8)

Klug testified that she understood that Meloy had agreed to transfer the $58,500 in

---

[12]  The run rate as originally calculated in the Conseco BARF was less than one hundred
percent (to wit, 95.4%), which entitled the DCLM Sales Executives to receive only the
"threshold rate" of commission, rather than the larger "commission rate" which they would
otherwise have been entitled to receive had the run rate exceeded one hundred percent.  (Pls.'
Resp. at 10-11, citing Meloy Dec. ¶ 15, Ex. E).  Sander and Meloy were informed of this fact by
Klug who said that "the BARF is calculating it incorrectly."  (Meloy Dec. ¶ 16, Ex. F).
Thereafter the calculation was corrected to include the Services and Education bookings that
Conseco had committed to pay causing the run rate for the Conseco Transaction to exceed one
hundred percent and entitling the Sales Executives to receive the full commission rate as
specified in their respective WEPs.  (Pl.'s Resp. at 11, citing Meloy Dep., Ex 4, MEL000257;
Meloy Dec. ¶ 17, Ex. G).

[13]  The Conseco transaction included $143,082.00 in New Products (Xcom and Service
Desk), $967,195.00 in Time, $206,220.00 in Capacity, and $86,100.00 in Services and
Education.  (Meloy Dec. ¶15, Ex. E.)  CA valued Ms. Meloy's contributions to the Conseco
transaction at $264,270.00.  (Pls.' Resp. at 10, citing Meloy Dec. ¶ 15, Ex. E).

sales revenue to Craig Sander's product set account.  (Klug Dep., pp. 107, 108, 112).

However, Meloy testified that Klug had instructed her to make that transfer, about which

she protested to Klug, saying, "hey, that's not fair," but then cloaked her opposition to

look as if she was "just joking around" because she did not want to "ruffle feathers."

Ultimately, Meloy did transfer the $58,000.00 value to Sander's product set.  (Pls.' Resp.

at 10, citing Meloy Dep., pp 86-87, 133; Meloy Decl. ¶ 14; see also Meloy Dep., p. 88;

Ex. 5.)

　　　　Meloy argues that she transferred the money out of fear that her failure to do so

would put her at risk of losing her employment.  CA challenges this evidence on the

grounds that a person cannot create a fact issue by submitting an affidavit that contradicts

her own prior sworn deposition testimony.  Kalis v. Colgate-Palmolive Co., 231 F.3d

1049, 1055-56 (7th Cir. 2000); Adusumilli v. City of Chicago, 164 F.3d 353, 360 (7th

Cir. 1998); Buckner v. Sam's Club, 75 F.3d 290, 292 (7th Cir. 1996).  In her affidavit,

Meloy averred: "I did transfer the money because I could not disobey a direct order by

my supervisor, Ms. Klug, without risking losing my job."  Meloy Aff. ¶ 14.  At her

deposition, Meloy testified that she transferred the money because she "wanted to have

good relationships within my work" and want to be viewed as a "team player."  Reply at

6, citing Meloy Dep. at 86.  CA states that Meloy's affidavit is an attempt by her to

overcome her prior insufficient testimony and that paragraph 14 of Meloy's Affidavit

must therefore be stricken.  Reply at 6-7.  Meloy rejoins that "supplemental affidavits can

be employed to clarify ambiguous or confusing deposition testimony."  Buckner v. Sam's

Club Inc., 75 F.3d 290, 292 (7th Cir. 1996).  In her surreply, she argues that her statement that she feared losing her job if she disobeyed her superior does not contradict her prior testimony, but merely supplements her deposition testimony in that she "had no intention of going anywhere" and "wasn't going to make a big stink about something" and she "wasn't going to ruffle feathers."  Surreply at 4, citing Meloy Dep. at 86.

We agree with CA that Meloy's affidavit statement does contradict her prior sworn deposition testimony and must be stricken.  See Flannery v. Recording Industry Ass'n of America, 354 F.3d 632 (7th Cir. 2004) (party cannot create a genuine issue of material fact by contradicting prior sworn testimony).  Meloy's deposition testimony was not ambiguous or confusing.  She stated that she transferred the money because she intended to continue working at CA, wanted to have good relationships at work, didn't want to "ruffle feathers" or "make a big stink about something" and wanted to be viewed as a team player.  These statements are not consistent with Meloy's subsequent assertion that she transferred the money because she feared losing her job if she disobeyed her supervisor.  Accordingly, paragraph 14 of Meloy's affidavit in which she avers: "I did transfer the money because I could not disobey a direct order by my supervisor, Ms. Klug, without risking losing my job," must be and is hereby **STRICKEN**.

During her deposition, the only employee Meloy was able to identify who acted to permanently deprive her of the use or benefit of her earned commissions was her supervisor, Ms. Klug, and apparently no one joined with Klug in that activity.  In response to questions regarding her conspiracy claim Meloy testified:

15

> I'm not saying that people intended to deprive me of my
> commission. What I'm saying is what I see from this, there
> was money that was owed.  It wasn't received and there are
> people involved in the process.

(Meloy Dep., pp. 133-34).  Further, Meloy never opened a commission "issue" with the

PeopleCall Center regarding the allocation of this $58,500, which she transferred to

Sanders.  (Meloy Dep., pp. 91, 127.)

> **E.      Meloy Files this Lawsuit**

On December 13, 2005, Meloy filed this action against CA in the Marion County

Superior Court, alleging breach of contract and violation of the Indiana Wage Statute

related to the Sallie Mae transaction and theft and conspiracy related to the Conseco

transaction.  CA was served with the summons and a copy of the complaint on January

12, 2006 and timely removed the action to this court on February 6, 2006.

## LEGAL ANALYSIS

## I.      STANDARD OF REVIEW

Summary judgment is appropriate when the record shows that there is "no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Disputes concerning material facts are genuine where the evidence is such that a

reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material

fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case.  Id. at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes.  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).  Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate.  See Shields Enterprises, Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary

judgment is not only appropriate, but mandated.  See Celotex, 477 U.S. at 322; Ziliak v.

AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003).  Further, a failure to prove one

essential element "necessarily renders all other facts immaterial."  Celotex, 477 U.S. at

323.

A plaintiff's self-serving statements, which are speculative or which lack a

foundation of personal knowledge, and which are unsupported by specific concrete facts

reflected in the record, cannot preclude summary judgment.  Albiero v. City of Kankakee,

246 F.3d 927, 933 (7th Cir. 2001); Stagman v. Ryan, 176 F.3d 986, 995 (7th Cir. 1999);

Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993).


**II.     DISCUSSION**

**A.     BREACH OF CONTRACT ARISING FROM SALLIE MAE
        TRANSACTION.**

CA seeks summary judgment on the breach of contract claim, stating that there is

no genuine issue of material fact in dispute and therefore it is entitled to judgment as a

matter of law.  CA maintains that the uncontroverted evidence establishes that it paid

Meloy all the commissions to which she was entitled on the Sallie Mae transaction and

that, accordingly, no breach of the Compensation Plan occurred.  Br. in Supp. of Summ.

J. at 9.  Meloy counters, arguing that genuine issues of material fact remain regarding the

methodology and figures CA used to compute the run rate for the Sallie Mae Transaction

and, further, that Indiana law requires the trier of fact to determine whether CA breached

its duty of good faith and fair dealing to Ms. Meloy, all of which prevents entry of summary judgment in CA's favor.  Resp. at 12.

"The essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages."  <u>Rice v. Hulsey</u>, 829 N.E.2d 87, 89 (Ind. Ct. App. 2005) (citing <u>Gatto v. St. Richards Sch., Inc.</u>, 774 N.E.2d 914, 920 (Ind. Ct. App. 2002)).  Both parties agree that the Compensation Plan is a contract and that it controls the amount and payment methodology of commissions Meloy was entitled to receive.  Br. in Supp. of Summ. J. at 9-11; Resp. at 12.

The parties' dispute distills into the question of whether the revenue associated with "Services and Education" sales was required to be included in the run rate calculation pursuant to the Compensation Plan.  This question, like issues of written contract interpretation generally, is particularly amenable to summary judgment because, where there is no contractual ambiguity, a contract's interpretation is resolvable as a matter of law.  <u>Automation By Design, Inc. v. Raybestos Products Co.</u>, 463 F.3d 749, 753 (7th Cir. 2006) (citing <u>Cherry v. Auburn Gear, Inc.</u>, 441 F.3d 476, 481 (7th Cir. 2006); <u>Orthodontic Affiliates, P.C. v. Long</u>, 841 N.E.2d 219, 222 (Ind. Ct. App. 2006) ("Generally, the construction of a written contract is a question of law for which summary judgment is particularly appropriate.")).

        **1.**      **The Undisputed Evidence Establishes that CA Properly Excluded Services and Education Bookings from the Run Rate Calculation**

Meloy contends that Ellen Taylor's calculation of the run rate (92.36%) was

incorrect because CA based this calculation on a division of the new dollars ($6,710,521.00) by the Average Annual Payment ($7,265,422.00), thereby omitting the one million "new dollars" that Sallie Mae had committed to pay for CA's Services and Education bookings in December 2004.  Resp. at 12.  Meloy maintains that, when the Services and Education bookings are included in the run rate calculation based on its having been a committed payment as of December 22, 2004, the run rate exceeds the one hundred percent level.  Assuming the run rate when properly applied exceeds the one hundred percent level, then CA breached the Compensation Plan by refusing to pay Meloy the commission to which she was entitled at her accelerated commission rate. Resp. at 14.

To recap the undisputed facts: Sallie Mae executed a Rate Agreement on December 22, 2004, obligating itself to pay CA a minimum of one million dollars for Services and Education products in addition to the products previously purchased by Sallie Mae on or before December 31, 2006.  (Meloy Dec. ¶ 5, Ex. A.)  The Rate Agreement was signed at the same time the primary Sallie Mae transaction document was signed.  Reply at 8.  According to the Rate Agreement, Sallie Mae was to pay CA fees for services performed on or before December 31, 2006.  In addition, the Agreement provided that at least $250,000 was to be paid each year at some time during the course of the year in varying increments, depending on the invoices sent to Sallie Mae for particular services.  The specific services CA was to perform for Sallie Mae were to be initiated by Sallie Mae and, following Sallie Mae's initial request, CA was to respond with a

20

"Statement of Work" covering each service project.  (See Meloy Aff. Ex. 1A, p.1.)

Meloy argues that Chapter 2 of the Compensation Plan (entitled "Direct Sales

Organization Provision") establishes that the calculation of the run rate was to include

payments "committed to CA" and that DLCM Sales Executives were entitled to a

commission on the Services and Education products sold by that Sales Executive.

Therefore, the one million dollars in Services and Education product purchased by Sallie

Mae (which potentially was payable over the course of two years) should have been

included in the run rate.  Resp. at 13, citing Meloy Dep., Exh. 3, § 2.2.1(b), CAI0015 and

CA10018).

CA contends that a sales executive's commissions for Services and Education

transactions are, in fact, covered by the more specific provisions found in Chapter 4 of the

Plan covering "CA Technology Services Provisions" and thus are calculated separately

from Direct Sales.  Section 2.2.1(b) of the Plan (referred to above by Meloy) provides

more fully:

> Under the FY05 Plan, *you may be eligible to earn
> Commissions for "Services" Transactions to the extent that
> such Transactions satisfy the requirements of this Plan,
> including those set forth in the CA Technology Services
> Chapter.*  "Services Transaction" shall mean a documented
> agreement, which commits CA to provide specified
> professional services and/or educational services (as described
> in greater detail below) to a CA Customer.  For purposes of
> this definition, qualified services include CA's service and
> educational offerings provided to a customer under a
> "Statement of Work," or other CA Technology Services
> Transaction Document approved for use by Execs.  Your
> actual Commission rates and related information, and your

> Services quota, if applicable are contained in the
> accompanying WEP.

Reply at 9-10, citing Plan, § 2.2.1(b) (emphasis added).  Section 4.2.1(a)(3) of the

Compensation Plan provides:

> For Services Transactions Documents with a duration of
> greater than one (1) year, Execs will only receive quota
> attainment and Commissions based on the SBV [Services
> Booking Value[14]] for the first year of such Transaction, and
> Cash Only Commissions based on the SBV for the second and
> third year of such Transaction, provided that the Customer
> remains within the assigned responsibility of that same Exec
> on each respective on each respective anniversary of the
> Services Transaction Document date.

Reply at 10, citing Plan, § 4.2.1(a)(3).).  Further: "Execs will be eligible for Commissions

and quota attainment for Services or Education Revenue based on the actual revenue

earned and recorded by CA . . . for work provided by CA to Customers pursuant to a

Services or Education Transaction Document."  (Plan, § 4.2.1(b).)  Meloy's WEP sets

forth separate quotas and commission rates for Services and Education sales and

transactions involving new products (Meloy Dep., Ex 4.)

   CA contends that including Sallie Mae's future structured Services and Education

payments "in a run rate calculation would defeat the purpose of run rate, as they did not

contribute to the 'constancy' of CA's payment stream; it was still uncertain when such

payments would be received during the transaction period, despite the fact that the client

---

[14] "SBV is defined as the value awarded by CA's applicable finance organization
("Finance") for an appropriate Services Transaction Document that satisfies all of the criteria of
this Plan. . . ."  (Plan, § 4.2.1 (a)(1).)

promised to pay such fees before a certain date."  Reply at 8.

Clearly the Services and Education products sold to Sallie Mae by CA do not
generate a constant pay stream because the Rate Agreement entered into by Sallie Mae
committed to the purchase of Sales and Education products in the amount of one million
dollars over the course of two years, but did not determine a specific date upon which
payment was due, making their inclusion in the run rate calculation inappropriate under
the applicable contractual provisions.  Our reading of the Compensation Plan causes us to
conclude that, when determining how commissions for Services and Education sales
should be computed, the parties were bound by Chapter 4 of the Compensation Plan,
entitled "CA Technology Services Provisions," which states, at § 4.1(a), that CA
Technology Services is comprised of Services, Education and Pre-Sales. . . ."  Meloy's
assertion that the parties intended to include revenue from Services and Education
product sales as part of the run rate when a client commits to their purchase over a period
of years is unpersuasive when the Compensation Plan is read in its entirety.  Our
conclusion is buttressed by the fact that Meloy's WEP assigned her a commission rate for
direct sales that was different from the rate for Technology Services & Education.  In
fact, Chapter Two of the Compensation Plan (the Direct Sales provisions), which
provides that the calculation for the run rate shall include payments "committed to CA"
also provides that a Sales Executive may be eligible for commissions on Services and
Education sales and references the requirements of Chapter Four (the CA Technology
Services chapter).  See Plan § 2.2.1(b).  Because the Services and Education products

were contracted for in the case at bar pursuant to a separate rate agreement rather than as a part of the Sallie Mae transaction documents, it is clear that the separate calculation of commission for Meloy's direct sales and her service and education sales is proper under the Compensation Plan, and that she received the commission to which she was entitled under the Plan provisions. We therefore <u>GRANT</u> Defendant's motion for summary judgment on Count I, finding that Meloy's claim fails to establish that Defendant breached their agreement when it excluded the million dollars in Services and Education purchased by Sallie Mae in the run rate.

### 2.   CA's "Sole and Absolute Discretion Clauses" are Not Implicated in this Dispute

CA asserts that "[t]he Plan expressly reserved to CA the right to determine, in its sole and absolute discretion, the values to be used in run rate calculations." Def. Brief, fn 6. Meloy claims that this provision (Meloy Dep., Ex. 3 § 2.3.2(g)(i)) is unenforceable because, on its face, it allows CA unfettered and unjustifiable freedom to select any numbers it may choose in a run rate calculation – for any reason it may choose – without permitting Meloy any opportunity for appeal or meaningful input or response. Meloy argues that Indiana law does not allow Indiana's employers to exercise such unchecked discretion over its employees' contractual rights. Resp. at 16, citing <u>Weiser v. Godby Bros., Inc.</u>, 659 N.E. 29 237, 240 (Ind. Ct. App. 1995).

We have concluded previously that CA did, in fact, properly exclude the Service and Education bookings from the run rate calculation, based on the plain language of the

24

Compensation Plan.  Accordingly, we find no reason to address the enforceability of the

Compensation Plan's provision giving CA a reservation of right to decide, in its sole and

absolute discretion, the values used in run rate calculations.  We shall leave this issue to

another case and another day.

### B.  INDIANA WAGE PAYMENT CLAIM ARISING FROM SALLIE MAE TRANSACTION.

In Count II of her complaint, Meloy repackages her breach of contract claim as a

violation of Indiana Code Section 22-2-5-1 et seq. by alleging that CA failed to pay her

the additional $ 81,027 to which she maintains she was entitled under the Plan relative to

the Sallie Mae transaction.  CA responds by contending that, because Meloy received all

commissions she was owed under the Plan including all payments for the Sallie Mae

transaction, the wage claim also fails as a matter of law.  Br. in Supp. of Summ. J. at 12.

Meloy seeks to fend off summary judgment by repeating her claim that she is entitled to

$81,027.00 as commissions on the Sallie Mae transaction.

As explicated above in Section II of this opinion, CA has paid Meloy all of the

commissions to which  she was entitled from the Sallie Mae transaction.  Therefore,

Defendant's motion for summary judgment on Count II of Meloy's complaint, based on

Indiana Code Section 22-2-5-1 et seq., is GRANTED.

### C.  THEFT CLAIM BASED ON MELOY'S REALLOCATION OF SALES REVENUE TO SANDER'S SALES LEDGER.

Meloy next contends that CA committed theft when, on March 8, 2005, Mary Klug ordered her to transfer $58,500.00 from her sales ledger to Craig Sander's sales ledger, thereby allowing him to be eligible for the Compass Club but depriving her of the value of commissions she had earned on the $58,500.00.  Resp. at 21.

To establish theft, Meloy must prove that a person "knowingly or intentionally exerted unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use."  Ind. Code § 35-43-4-2.  Indiana Code Section 35-41-2-2 provides, "A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so."

> "Intent can be inferred from a defendant's conduct and the natural and usual sequence to which such conduct logically and reasonably points." E.H. v. State, 764 N.E.2d 681, 683 (Ind. Ct. App. 2002), trans. denied.  "The fact finder is entitled to infer intent from the surrounding circumstances." Id.  Intent is a mental function; hence, absent a confession, it often must be proven by circumstantial evidence.  See Duren v. State, 720 N.E.2d 1198, 1202 (Ind. Ct. App. 1999), trans. denied; see also Ritchie v. State, 809 N.E.2d 258, 270 (Ind. 2004).

Hightower v. State, 2007 WL 1438693, *7 (Ind. Ct. App. 2007).

The facts related to this claim establish that on March 30, 2005, Conseco executed an agreement to purchase software from CA.  Part of this transaction included Conseco's purchase of additional licenses and new products sold by Meloy.  The Conseco Transaction entitled Meloy to commissions on $264,270.00, but Meloy alleges that she was required to effect an internal transfer of $58,500.00 of that amount from her account

26

to Craig Sander's account.  (Meloy Dep., p. 133.)  By multiplying the $58,500 by

Meloy's Accelerated Commission Rate (11.05%), as provided in her WEP, Meloy

represents that she lost $6,464.00 in commissions which she would have otherwise

received but for the transfer.  Resp. at 22.

No one disputes that the $58,500 qualifies as "property" under Indiana law and

that such amount represented value to Meloy.  See Ind. Code § 35-41-1-23.  Indiana law

defines property as anything of value and includes: intangibles, written instruments

concerning labor, services, or property; written instruments otherwise of value to the

owner, contract rights and other interests in or claims to wealth.  Id.

Meloy argues that:

> As the Sales Manager, Mary Klug was Ms. Meloy's
> supervisor.  Ms. Klug was also responsible for evaluating Ms.
> Meloy's performance as a sales executive.  Further, Ms. Klug
> was responsible for managing, processing, and distributing
> commissions.  Ms. Klug knew that she could not transfer Ms.
> Meloy's sales revenue herself.  (Klug Dep., at 109).  So,
> instead, on March 8, 2005, she simply ordered Ms. Meloy to
> do it.  Ms. Klug made it clear to Ms. Meloy that she was the
> manager, and that she could structure the Conseco
> Transaction funds however she wanted.  (Meloy Dep., at 85-
> 87.)  Ms. Meloy protested in a manner that was designed not
> to jeopardize her professional position.  But, of course, even
> after complaining to CA's Senior Analyst at the GSO, Ellen
> Taylor, Ms. Meloy felt she had no choice but to transfer the
> money, as Ms. Klug ordered her to do.  (Meloy Dep., at 86-
> 91).

Resp. at 23.  Meloy maintains that it is not reasonable to conclude that she would have

voluntarily given up nearly $6,500.00 in commission and that the only reason she did was

because Klug ordered her to do so.  Meloy admits that she liked her co-worker Sander and that she gave gifts to other co-workers from time to time to thank them for aiding her on certain projects.  But, she says, she never relinquished her own commissions nor would she have given up what amounted to ten percent of her base salary simply on the basis of her friendship with Sander.  Resp. at 23, citing Meloy Dep. at 23.[15]  Resp. at 23.

Meloy contends that a supervisor who orders a subordinate to transfer money satisfies the control element of the theft statute (Indiana Code § 35-41-2-2).  Resp. at 22 and 24, citing In re Estate of Wade, 768 N.E.2d 957, 961-62 (Ind. Ct. App. 2002).  CA rejoins that no one actually took Meloy's property from her because that would have been unnecessary since Meloy, herself, made the reallocation on the business forms that she, herself, submitted prior to the payment of any commission.  According to CA, Meloy was the person who "exercised control" over the amount, not CA or Klug.  Br. in Supp. of Summ. J. at 13.  Meloy replies that, while Klug admittedly did not personally transfer the money, Klug did exert coercive influence over Meloy which, in light of her superior position as Meloy's supervisor, resulted in Meloy's feeling compelled to act in a way she otherwise would not have.

Whether a theft occurs where the alleged perpetrator never actually possesses the

---

[15]  As stated previously, paragraph 14 of Ms. Meloy's affidavit which states that she transferred the money because she feared losing her job if she disobeyed her supervisor is STRICKEN.  This statement contradicts deposition testimony regarding why she transferred the $58,000 and "[t]his circuit does not permit a party to create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony."  Buckner v. Sam's Club Inc., 75 F.3d 290, 292 (7th Cir. 1996).

property, but acts in such a way as to compel or coerce the property owner to give up his/her interest in the property for the benefit of the perpetrator appears to be a novel question under Indiana law.  The parties have cited no case directly on point and our research did not uncover one either.  Meloy cites In re Estate of Wade, 768 N.E.2d 957, 961-62 (Ind. Ct. App. 2002), but that case is not on point because it relates to the presumption of fraud under the theory of undue influence in a fiduciary relationship between an attorney-in-fact and an 83-year-old-woman for the benefit of the fiduciary.

Our reading of the Indiana theft statute requires Meloy to be able to show that Klug "knowingly or intentionally exert[ed] unauthorized control over" the $58,000 in Meloy's account – funds that were rightfully the property of Meloy – and did so with the intent to deprive Meloy of some part of its value.  See Ind. Code § 35-43-4-2.  To make this showing, Meloy need not establish that Klug physically performed the transfer, rather only that she effectively "controlled" the transfer.  On this issue, Meloy has presented no evidence that Klug ever "controlled" the transfer.  There is evidence that Meloy was faced with a choice between two unappealing options: she could forego her earned commissions in order to benefit her co-worker and win their approval, or she could retain the commissions and incur the disapproval of her supervisor.  While Meloy testified that she was concerned about "ruffling feathers" and wanted to be seen as a team player, there is no evidence that she believed she would face anything other than disappointment or disapproval if she disobeyed Klug's order.  Similarly, there is no evidence that Meloy ever expressed to Klug that she did not wish to make the transfer or that she was making

it against her will.  Meloy confronted what was for her a hard call and apparently reluctantly acquiescenced in the transfer.  But at no time did CA or Klug control her decision or override her will.  At all times, she had a choice.  Thus, Meloy cannot state a claim for theft and CA's motion for summary judgment on Count III must be **GRANTED**.

### D.   CONSPIRACY ARISING FROM THE REALLOCATION OF PLAINTIFF'S CONSECO DEAL SALES REVENUE TO SANDER.

In a final effort to defeat CA's motion for summary judgment, Meloy characterizes her civil conspiracy claim as being derivative of her theft claim, arguing that she incurred damages when two or more employees at CA conspired to exert unauthorized control over her Conseco sales revenue, thereby causing her to lose the $6,500.00 in commissions.  Resp. at 20.  In support of this claim, Meloy repeats that Klug exerted unauthorized control over her property when she required Meloy to reallocate her sales revenue to Sander and in doing so involved other members of management, such as Ellen Taylor,[16] in the conspiracy based on their awareness of Klug's actions and well-knowing that Meloy objected to Klug's conduct which was not authorized by Meloy.  Resp. at 21, citing Meloy Dep., p. 91.

Under Indiana law, a civil conspiracy claim cannot stand alone, but derives from

---

[16]  CA states that Ellen Taylor was "a non-management employee like [Meloy]."  Reply at 17-18.  For the purposes of this motion, we assume that Taylor is a manager, as Plaintiff claims.

another alleged wrong.  "Indiana courts have been clear that, 'although there is no cause of action for conspiracy in Indiana, there is a cause of action for damages resulting from conspiracy." Huntington Mortgage Co. v. DeBrota, 703 N.E.2d 160, 168 (Ind. Ct. App. 1998) (citing Indianapolis Horse Patrol, Inc. v. Ward, 247 Ind. 519, 522, 217 N.E.2d 626, 628 (1966)).  In this case, Meloy alleges that her conspiracy claim is "derivative" of her theft claim.

As discussed above, we have granted summary judgment on Meloy's theft claim. This alone is enough to warrant dismissal of the conspiracy claim.  But Meloy's conspiracy claim can not survive summary judgment for another reason as well.  To be entitled to damages on this conspiracy claim, Meloy must have evidence to establish "a combination of two or more persons, [joined] by concerted action, to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means." Huntington Mortgage Co., v. DeBrota, 703 N.E.2d 160, 168 (Ind. Ct. App. 1998).  "Concerted action" is defined as "action that has been planned, arranged, adjusted, agreed on and settled between parties acting together pursuant to some design or scheme."  (Black's Law Dictionary at 289 (6th ed.))  Meloy has adduced no evidence to establish that two or more persons engaged in any concerted action against her; in fact, she has admitted that she is "not saying people intended to deprive [her] of [her] commission" and further that she does not "have specific names" of CA employees "who . . . worked in concert to deprive [her] of earned commissions."  (Meloy Dep. at 133-34.) Based on the facts adduced here, only one person, Klug, took any action to deprive Meloy

of her commissions.  Without something beyond the alleged awareness of Klug's actions

by another manager, Meloy's conspiracy claim fails and summary judgment is

<u>GRANTED</u> in favor of CA on the conspiracy claim.


## CONCLUSION

As explained above, Defendant's motion for summary judgment on Plaintiff's

breach of contract claim, Indiana Wage Payment claim, and theft and conspiracy claims is

<u>GRANTED</u>.  Meloy's Complaint is therefore <u>DISMISSED</u> in its entirety and final

judgment shall be entered accordingly.  IT IS SO ORDERED.


Date: _____06/12/2007_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Samuel Dustin Ellingwood
POTTER LAW GROUP PC
sellingwood@potterlawgroup.com

James A. Geiger
POTTER LAW GROUP
jgeiger@potterlawgroup.com

Bonnie L. Martin
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
bonnie.martin@odnss.com

William C. Potter II
POTTER LAW GROUP
wpotter@potterlawgroup.com

Kenneth B. Siepman
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
kenneth.siepman@odnss.com